Magnolia Lumber Corporation, Inc. v. Commissioner.
Magnolia Lumber Corp. v. Commissioner
Docket No. 91269.
United States Tax Court
T.C. Memo 1962-224; 1962 Tax Ct. Memo LEXIS 85; 21 T.C.M. (CCH) 1182; T.C.M. (RIA) 62224; September 20, 1962
*85 John L. Flynn, Esq., for the petitioner. Aaron S. Resnik, Esq., and Donald G. Daiker, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined a deficiency of $94,175.25 in income tax for the fiscal year ended June 30, 1951. The parties, by agreement, have disposed of certain adjustments, and the only issue remaining for our determination is whether or not the payment of a commission of 8 percent to the Magnolia Lumber Sales Company for services rendered during each of the fiscal years ended June 30, 1951, and June 30, 1952 [1] was reasonable. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner, a Mississippi corporation, filed its income tax returns for the fiscal years ended June 30, 1951, and June 30, 1952, with the district director of internal revenue at Jackson, Mississippi. The petitioner was organized in 1947 and engaged in the manufacture of lumber in Oregon and Mississippi. The stockholders of petitioner during *86 the years involved herein were as follows: R. Drew Lamb and his wife, Zelma C.
Lamb
85%
O. D. Carroll, Mrs. Lamb's father
5%
Corrine Lamb Gore, sister of R. Drew
Lamb
5%
W. H. Becker, Sr., petitioner's accountant
5%
The petitioner and other manufacturers of lumber usually made use of lumber wholesalers or lumber brokers to dispose of their products. The lumber wholesaler took title to the lumber in his own name, became personally liable to the mill for the purchase price, assumed any credit risks, specified the manner of railroad routing and handled any claims resulting from the shipment of the lumber. The wholesaler paid the mill either a net price or a gross price less a functional discount. The mill established the type of price, i.e., whether net or gross. There was no uniform trade practice either as to the method of pricing or the amount of functional discounts offered. The larger mills tended to grant discounts; the smaller mills preferred to sell net. The functional discounts could be as low as 3 percent or as high as 8 percent. However, during 1950 through 1952 a discount of 5 percent was the most frequently offered, and a discount of 8 percent was *87 not common. In order for a wholesaler to obtain a discount of 8 percent during the years 1950 to 1952, he was usually required to render additional services to the mill or to sell the lumber at a specified maximum price. Generally, the wholesaler was free to sell at any price and was not required to remit any of his profit to the mill. The lumber broker, as distinguished from the lumber wholesaler, would act merely as a sales agent for either a wholesaler or the mill. He would be paid a specified percentage, usually 3 percent, by whoever employed him. He did not take title to the lumber, was limited in the amount of his profit, and aside from bringing buyer and seller together performed no services for his employer. Because of the services rendered by the wholesalers, the mills preferred to distribute their products through them. The brokers, on the other hand, were used primarily by the wholesalers. Prior to July 1, 1950, most of the petitioner's sales were made at the mill to wholesalers who called at the premises. The sales were handled by petitioner's bookkeeper. The pricing practice of petitioner varied - on occasion it sold at net - at other times it sold at gross with *88 a functional discount. In practice, whether the petitioner sold at net or gross with a discount, the amount it realized was usually the same. Petitioner paid functional discounts which varied from time to time between 3 percent and 8 percent. In the early part of 1950, the officers of petitioner began to consider the possibilities of establishing an independent sales company to act as petitioner's wholesaler. The intention of the officers in establishing such a business was predicated in part upon their desire to obtain for petitioner some of the profits being earned by the wholesaler and upon their desire to establish branch offices so as to bring petitioner in closer touch with the market. It was also contemplated that the sales company would buy lumber from other mills. On June 30, 1950, the minutes of petitioner provided as follows: R. Drew Lamb was instructed to negotiate and make a contract for the sale of all lumber manufactured by the corporation through the Magnolia Lumber Sales Company, terms of the contract to be made by Mr. Lamb not to exceed 8% commission on final price, f.o.b. mill, this commission not to affect the cash discount. The Magnolia Lumber Sales Company, *89 hereinafter referred to as the sales company, was organized on July 1, 1950, with an initial capitalization of $10,000. The partners were the stockholders of petitioner, and their respective partnership interests were identical to their respective stock ownership interests in petitioner. During the period beginning July 1, 1950, through June 30, 1952, the sales company acted as exclusive wholesaler for the petitioner's mills in Oregon. These mills accounted for approximately 95 percent of the petitioner's production. [2] All sales of petitioner's lumber by the sales company were made on invoices in the name of the sales company in conformity with the general practice in the industry as to the relationship between the mill and the wholesaler. For the fiscal year ended June 30, 1951, petitioner's lumber sales through the sales company totalled $3,817,139.68, and for the fiscal year ended June 30, 1952, petitioner's lumber sales through the sales company totalled $3,164,336.57. The petitioner paid or accrued commissions upon such sales totaling $375,786.78 for the fiscal year ended June 30, 1951, and $305,279.18 for the fiscal year ended June 30, 1952. As a result of an oral agreement *90 between petitioner and the sales company, the latter's commission was limited to 8 percent on the final selling price. [3]
In addition to performing the usual services of a lumber wholesaler, the sales company supervised the loading of petitioner's Government orders, and provided petitioner with the services of a freight clerk, an invoice clerk and a bookkeeper. Prior to the formation of the sales company, these employees had for the most part been employees of the petitioner. The sales company also employed and paid the salary of a sales manager who also had previously been the employee of petitioner. During the years involved herein the sales company acted as a lumber wholesaler for DeMers Milling & Lumber Company, a company which operated a sawmill in Yreka, California. R. Drew Lamb owned a 51-percent interest in the DeMers Company. The sales company was paid a commission by DeMers of 5 percent, plus a 2-percent cash discount for *91 rendering its services. The sales company also acted during the years 1951 and 1952 as a lumber wholesaler for the Carroll-DeArmond Company, a company engaged in a business similar to petitioner's. The commissions received by the sales company from the Carroll-DeArmond Company were at the rate of 5 percent, plus a 2-percent cash discount. The services rendered by the sales company to the DeMers Company and Carroll-DeArmond were not as extensive as those rendered to the petitioner. Immediately after the outbreak of the Korean conflict in June 1950, a tremendous upsurge occurred in the lumber industry in this country. All grades of lumber were soon in demand, and a seller's market developed. By 1951, the demand for lumber was so great that mills were selling all the lumber they could produce. As a result, direct selling costs were considerably reduced. These conditions existed during both of the years involved in this proceeding. Immediately after June 30, 1952, the commission arrangement between petitioner and the sales company was reduced from 8 percent to 5 percent. The parties stipulated that for the fiscal years ended June 30, 1951, and June 30, 1952, the petitioner deducted *92 as commissions accrued to the sales company the amounts of $375,786.78 and $305,279.18, respectively. The respondent determined that the amount of commissions accrued in excess of 5 percent was excessive and, accordingly, disallowed as a deduction the amount of $112,404.14 for the fiscal year ended June 30, 1951, and the amount of $86,939.96 for the fiscal year ended June 30, 1952. Opinion The only issue in this case is whether the sales commissions paid by petitioner to a lumber sales company owned by petitioner's stockholders were excessive. In this respect, since the petitioner and the sales company were owned and controlled by the same individuals, the transactions must be scrutinized carefully. In support of his determination that the commissions were excessive, respondent refers to the fact that the usual commission paid in the lumber industry was 5 percent, that a commission of 8 percent was extremely rare, that the commission of the sales company from mills other than petitioner's did not exceed 5 percent, and that due to a seller's market existing during the taxable years, petitioner could have sold as much lumber as it could have produced with a minimum of cost. Petitioner's *93 case is predicated on a showing that commission of 8 percent was not unusual if the lumber wholesaler rendered additional services; that the sales company in addition to performing the regular services of a wholesaler provided petitioner with special services including those of a freight clerk, an invoice clerk and a bookkeeper; and that when the lumber wholesaler's profit was not the difference between the price he paid for the lumber and the final sales price, but was a fixed percentage of the final sales price, it was not unusual for a mill to pay a higher commission. We have been persuaded that the special services rendered by the sales company to petitioner, as well as the restricted commission provision, justify petitioner's payment of a commission in excess of 5 percent to the sales company. We have not been persuaded, however, that a commission of 8 percent was reasonable during the years 1951 and 1952. The record is clear that a seller's market existed during this period and that direct selling costs were considerably reduced. Even assuming that an unrelated lumber wholesaler would have been willing to perform the same special services as the sales company and to operate *94 under a restricted commission arrangement, we do not believe petitioner would have been willing to pay a commission of 8 percent. Accordingly, we hold that a commission of 6 3/4 percent was reasonable under the circumstances of this case. Decision will be entered under Rule 50. Footnotes
1. The fiscal year ended June 30, 1952, is involved by virtue of a claimed carryback loss, the amount of which is challenged by respondent.↩
2. The remainder of petitioner's production came from its Mississippi mills. ↩
3. The petitioner also granted the sales company a 2-percent discount. A 2-percent discount for prompt payment was a recognized trade custom in the lumber industry.↩